Argued March 2, affirmed and remanded with instructions May 20, 1976, petition for rehearing pending

## ACMER CORPORATION,
### *Respondent and Cross-Appellant,*
### *v.*
## STATE TRANSPORT COMPANY,
### *Appellant and Cross-Respondent.*
549 P2d 1114

*Robert E. Franz, Jr.,* Eugene, argued the cause for appellant and cross-respondent. On the briefs was Donald A. Gallagher, Jr., of Jaqua & Wheatley, Eugene.

*Paul D. Clayton,* of Luvaas, Cobb, Richards & Fraser, Eugene, argued the cause and filed a brief for respondent and cross-appellant.

Before O'Connell, Chief Justice, and McAllister, Denecke, Holman, Howell and Bryson, Justices.

DENECKE, J.

## DENECKE, J.

The plaintiff, Acmer Corporation, contracted with the defendant, State Transport Company, a corporation, to attempt to sell Transport's business. Acmer brought this action to recover a commission for performing that contract. The trial court, sitting without a jury, gave judgment to Acmer. Transport appeals.

The issues are whether the president of Transport was authorized to contract for Transport and whether Transport caused the sale arranged by Acmer to abort.

Transport is in the trucking business. Transport's stock was held: John Gallagher, Jr., and wife, 499 shares (about 80 per cent); Donald Gallagher and wife, 130 shares; Robert Mix, John's attorney, 1 share. The directors were John Gallagher, his wife, Donald Gallagher, and Robert Mix. John was president.

On November 6, 1972, John Gallagher, as president of Transport, executed a contract authorizing Acmer to sell Transport's equipment. The price was to be $140,000. An exclusive agency was given for 90 days and Transport agreed to pay a 10 per cent commission. The next day the board of directors met and considered the contract. Donald Gallagher left the meeting after talking with his attorney. The remaining directors authorized the contract with Acmer.

About January 1, 1973, Acmer started negotiating for a sale of Transport to Independent Motor Transport, Inc. (IMT). On February 6, 1973, John Gallagher, on behalf of Transport, executed another contract renewing plaintiff's agency to sell Transport for another 90 days. On April 17, 1973, John Gallagher, as president of Transport, executed a sales contract with IMT. Transport contracted to sell its stock for $65,000. The contract was not performed, either because Donald Gallagher would not sell his stock or because John Gallagher sold his stock to Donald.

Defendant contends John Gallagher had no author-

ity to sell the stock of Transport, as distinguished from its assets.

■ This is a law action; therefore, if there is any evidence to support the trial court's general finding for plaintiff, we must affirm. The trial court made no special findings.

The two written contracts by Transport with Acmer provide that Acmer is authorized to sell assets. The minutes of the directors' meeting state that the contract with Acmer was approved except the "contract be changed to delete any mention of any exchange or lease of the property." John Gallagher testified, however, that at this directors' meeting counsel suggested that the proposal be changed from a sale of assets to a sale of stock. He further testified that the directors agreed at the same meeting that the stock rather than assets should be sold. He further testified that he informed Acmer that the sale was to be of stock, not assets. Acmer confirmed this by a letter to John Gallagher, stating:

> "Regarding the employment contract with ACMER Corporation in the representation of STATE TRANSPORT COMPANY, please be advised that the intent of the contract is to represent a sale of the corporate stock of State Transport Company * * *."

■■ Minutes of a corporate board of directors' meeting are but "prima facie evidence of the facts stated." *Stipe v. First National Bank,* 208 Or 251, 278, 301 P2d 175 (1956). The trial court could have found that in the November 6, 1972, meeting the directors authorized Acmer to make a sale of stock, rather than assets.

The contract of February 6, 1973, renewing Acmer's authority to make a sale is identical to the earlier contract. The February contract continued to state that Acmer was authorized to "sell, exchange or lease the property." There is no evidence to indicate that Transport intended the February contract to be any different than the earlier contract; that is, Transport intended the "exchange or lease" provision to be

deleted and the sale to be of stock rather than assets. The agent of Acmer so testified and that is the clear inference to be drawn from John Gallagher's testimony. The trial court could have found the February agreement authorized Acmer to continue to attempt to sell the stock of Transport.

The written authorizations to Acmer were to sell for $140,000, whereas the contract of sale procured by Acmer and which John Gallagher signed for Transport was for $65,000 and other terms were different than those specified in the written agreements. Defendant contends that contract in the amount of $65,000 was not authorized by Transport.

The written contract between Acmer and Transport provided that Acmer was given the right to sell at the price and terms specified "or at such lesser price and upon such terms as the Owner [Transport] may hereafter accept." The minutes of the board of directors' meeting of Transport, held November 6, 1972, provided:

"* * * To further assist the President in negotiations with other firms or people regarding the sale of State Transport Company it was moved, seconded and passed that the board give the president the authority to negotiate with any parties, including Akmer [sic] Corporation, for the sale of State Transport Company subject to the approval of the owners of two-thirds of the stock of the corporation."

That paragraph is construed to mean that the president, John Gallagher, is authorized to negotiate the terms of a contract of sale for Transport; however, the terms negotiated and agreed upon must be approved by the owners of two-thirds of the stock.

John Gallagher negotiated the sale for a price of $65,000. There was no formal approval by two-thirds of the stockholders, but John Gallagher, the holder of more than two-thirds of the stock, approved the sales contract by executing it on behalf of Transport.

O'Neal states, generally: "The courts have

repeatedly departed from the traditional rule [requiring duly called meetings] in order to sustain action taken by participants in a close corporation without formal shareholders' or directors' meetings." 2 O'Neal, Close Corporations § 8.03 (1971). We previously have approved stockholder approval such as John Gallagher gave in this case by executing the sales contract with IMT as president. In *First Nat. Bank of Burns v. Frazier,* 143 Or 662, 674-677, 19 P2d 1091, 22 P2d 325 (1933), a hardware company sought to foreclose a chattel mortgage of all of the stock of I. S. Geer & Company. The validity of the mortgage was attacked because the board of directors did not authorize its execution. Waldo Geer was president of the mortgagor and Inez Geer was secretary and they were two of the three directors. They signed the mortgage. We held the mortgage was validly executed:

> "Although the minutes of the corporation were not produced, the evidence is clear that no formal resolution authorizing the execution of the mortgage was adopted. As the mortgage was signed by Waldo Geer as president and Inez Geer as secretary of the corporation, it must be assumed that they consented to its execution. * * *." 143 Or at 675.

We further held that the approval of two directors was sufficient.

We hold in this case that there was evidence from which the trial court could have found John Gallagher was authorized on behalf of Transport to enter into the sales contract with IMT.

■ Defendant further contends that plaintiff is not entitled to its commission because the sale was not completed and the failure to complete was not caused by any wrongful act of the seller, Transport.

The sale was not completed because Transport could not transfer the stock to IMT. Defendant argues that this was not a wrongful act on the part of Transport because it did not own the stock and it could not compel the owners to transfer the stock to IMT.

We held to the contrary in a legally similar situation in *Woodworth v. Vranizan,* 273 Or 111, 118-119, 539 P2d 1055 (1975). We there held that the husband seller was liable for a commission when the broker produced a buyer but the husband was unable to secure the signature of his wife, who had an interest in the property, to an earnest money agreement. We quoted from *Max Broock, Inc. v. Walker,* 349 Mich 63, 66, 84 NW2d 336 (1957):

" '* * * It in no wise differs in this respect from a contract to sell lands which one does not own at the time he makes such contract. The fact that one did not have the legal title at the time he made the contract, and could not procure it afterwards, has never been recognized as a legal defense to an action for breach of the contract.' "

We further stated:

"The result would probably be different if the broker knew before he procured a buyer that the seller's wife would not join in the contract or conveyance; however, there is no evidence to that effect in this case." 539 P2d at 1059.

Acmer's agent testified that he knew Donald Gallagher held a minority stock interest. He further testified, however, that John Gallagher never indicated that there would be any difficulty in securing Donald Gallagher's stock and Acmer did not anticipate any difficulty. John Gallagher's testimony at least partially contradicted Acmer's evidence; however, the trial court could find that Acmer did not know that Transport might not be able to secure all the stock for transfer. The trial court could further find that the transaction was not completed because Transport failed to perform as agreed in its contract with IMT.

Acmer has cross-appealed for attorney fees incurred in the trial court. The contract provided for attorney fees and the parties stipulated fees could be fixed without evidence. Through some misunderstanding this was not done before Transport filed its notice of appeal. The trial court was of the opinion that after the notice of appeal was filed it no longer had jurisdic-

tion to fix fees. Assuming that was correct, the trial court can give a judgment for fees upon remand.

Affirmed and remanded to enter judgment for attorney fees for services at trial.